WO

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Arjon Peirre Booker Minfee,<br><br>Defendant. | **No. CR-25-04834-TUC-JCH (EJM)**<br><br>**REPORT AND RECOMMENDATION** |

Pending before the Court is the defendant's Motion to Suppress Evidence obtained and derived from the unconstitutional stop of his vehicle. (Doc. 48.)  For the reasons discussed below, it is recommended that the District Court deny the motion.

## I.    PROCEDURAL BACKGROUND

On November 25, 2025, a federal grand jury sitting in Tucson, Arizona, returned a three-count indictment against the defendant.  (Doc. 30.)  Count One charges the defendant with Conspiracy to Transport Illegal Aliens for Profit, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(v)(I), (a)(1)(A)(ii), & (a)(1)(B)(i); Counts Two and Three charge the defendant with Transportation of Illegal Aliens for Profit, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(ii) & (a)(1)(B)(i).  (*Id.*)

On February 12, 2026, the defendant filed his suppression motion arguing that the Border Patrol agent did not have reasonable suspicion to stop his vehicle; as a result, evidence obtained and derived from the unconstitutional stop should be suppressed as fruit of the poisonous tree.  (Doc. 48 at 1, 8.)  The defendant further argues that the Border Patrol

agent stopped his vehicle based on a hunch and improperly used generalizations that "cast suspicion on large segments of the law-abiding population" to justify the stop. (*Id*. at 4–6.)  Finally, the defendant asserts that his race improperly factored into the agent's decision to conduct the traffic stop. (*Id*. at 6–8.)  The government counters that reasonable suspicion for the stop was based on the totality of the circumstances and there is no evidence that race played any role in the agent's decision to conduct the stop.  (Doc. 52 at 4.)

On March 9, 2026, the Court held an evidentiary hearing.  (ME 3/9/2026, Doc. 56)

## II.    FACTUAL BACKGROUND

At the evidentiary hearing, Border Patrol Agent Paulo Ramirez was the only witness.  His testimony is summarized below.

Paulo Ramirez has been a Border Patrol agent for two years.  (Hr'g Tr. 3/9/2026 at 5, Doc. 59.)  He is assigned to the Sonoita station, which is located approximately 20 miles from the international border.  (*Id*. at 4.)  One of his main assignments is doing roving patrols on State Route ("SR") 82 which is a known alien smuggling route.  (*Id*. at 5.)  SR 82 is a two-lane road that runs east and west.  (*Id*. at 9.)  SR 82 connects with Interstate 19, as well as SR 83 and SR 90, which connect with Interstate 20.  (*Id*. at 6.).  Alien smugglers use SR 82 because there is a Border Patrol checkpoint situated on Interstate 19 that is staffed 24 hours every day of the week.  (*Id*.)  Because the checkpoints on SR 83 and SR 90 have not been in operation, smugglers avoid Interstate 19 and instead use SR 82, SR 83 and SR 90 to get to Interstate 10.  (*Id*.)

On October 31, 2025, Agent Ramirez parked his patrol vehicle facing eastbound on SR 82 so he could see vehicles traveling from the Nogales area.  (*Id*. at 20.)  He first saw the defendant's vehicle around mile marker 23 traveling eastbound; the defendant was driving well below the 55 mile per hour speed limit at "an unusually slower [speed] than the rest of the traffic[—][t]here was a line of vehicles behind it that were trying to [pass] it." (*Id*. at 7–8, 15.)  Vehicles traveling on that section of SR 82 "usually tend to go faster" than the speed limit.  (*Id*. at 9.)

When the defendant's vehicle was driving by Agent Ramirez, he saw the driver

exhibit "distinct patterns of nervous behavior": the defendant had a rigid posture, was tightly gripping the steering wheel, and looked straight ahead and did not glance at Agent Ramirez's vehicle. (*Id*. at 9, 23.) It is common for people involved in smuggling to exhibit this type of nervous behavior because they are anxious or highly stressed. (*Id.* at 9.) Agent Ramirez could not see whether there were any passengers in the vehicle because he was focused on the driver's behavior. (*Id*. at 29–30, 38.)

Based on the defendant's driving behavior and signs of nervousness, Agent Ramirez decided to follow the defendant's vehicle. (*Id*. at 7.) After Agent Ramirez passed the other vehicles, he positioned his vehicle about a car's length behind the defendant's vehicle. (*Id.* at 25–26.) He could not see if there were passengers because of the dark window tinting. (*Id.* at 39.) Agent Ramirez "noticed that the [defendant's] vehicle was heavily laden," which means that the vehicle likely had more than one occupant. (*Id*. at 9–10.) The vehicle "would bottom out" when it went over "slight deviations in the road." (*Id*. at 30.)

Agent Ramirez also noticed slight but "consistent swerving within the fog lines[.]" (*Id*. at 14, 17.) In Agent Ramirez's experience, that driving behavior is suspicious because it shows that the driver is "hyperfixated" on the law enforcement vehicle behind them rather than concentrating on the road in front of them. (*Id.* at 14.)

The defendant was driving an "older model vehicle." (*Id*. at 10.) Agent Ramirez explained that alien smugglers commonly use older vehicles with temporary plates because they want to minimize financial loss if a vehicle is seized by law enforcement. (*Id*. at 10–11.) For example, the value of the defendant's vehicle is approximately $1,800 and it costs approximately $5,000 for a person to be able to "retrieve [a seized] vehicle." (*Id*. at 11.)

The defendant's vehicle also had a temporary license plate. (*Id*. at 10.) Alien smugglers use temporary license plates because it is harder for agents to identify facts about the registered owner. (*Id*. at 12.) When the license plate is run through Border Patrol's "communication system, the only thing that's going to come out is basically the name of the new registered owner"; no address or birthdate for the owner is provided. (*Id*.) Agent Ramirez has had cases where smugglers use "ghost dealers," which means that "people

basically forge temporary plates in order to conceal the identity of the people that are smuggling humans." (*Id*.)

Prior to making the traffic stop, Agent Ramirez learned that the vehicle was registered to Arjon Peirre Booker Minfee and "was registered out of Avondale, Arizona," which is in the Phoenix area about 150 to 200 miles from where the traffic stop occurred. (*Id*. at 13.)   Because of the large population in the Phoenix area, alien smuggling "coordinators usually tend to recruit people from Phoenix and the surrounding cities to come all the way down to Sonoita, Arizona to pick up illegal aliens." (*Id*.)  Agent Ramirez performed a traffic stop of the defendant's vehicle between mile marker 28 and 29 on SR 82. (*Id*. at 7.)

Agent Ramirez did not stop the defendant's vehicle based on any one suspicion; his stop was based on the totality of the suspicious behaviors that he observed. (*Id.* at 16–17.) Agent Ramirez was able to see the driver's race; however, race played no role in his decision to stop the vehicle. (*Id*. at 14.)  Agent Ramirez has implicit bias training once a year with the Border Patrol, as well as while in the Marine Corps. (*Id.* at 24.)

Agent Ramirez has stopped vehicles "many times" where his investigation reveals that no criminal activity was occurring. (*Id.* at 33.)  He does not keep statistics for stops that do not reveal criminal activity. (*Id.* at 33–34.)   However, he believes that those statistics must be kept by someone within Border Patrol because he reports all traffic stops, regardless of whether an arrest is made. (*Id* at 34, 39–40.)

## III.    DISCUSSION

When determining if there was reasonable suspicion for a vehicle stop, a court must consider the "totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002).  The Supreme Court has recognized that "[a]ny number of factors may be taken into account in deciding whether there is reasonable suspicion to stop a car in the border area." *United States v. Brignoni-Ponce*, 422 U.S. 873, 884–85 (1975).  The factors an officer may consider include: (1) the characteristics of the area in

which they encounter the vehicle; (2) the proximity to the border; (3) the usual traffic patterns on the particular road; (4) previous experience with alien traffic; (5) information regarding recent illegal border crossings in the area; (6) driving behavior, such as erratic driving or obvious attempts to evade officers; (7) the behavior and appearance of the driver; and (8) aspects of the vehicle itself. *Id.* at 884–85 (citations omitted). This list is non-exhaustive. "Not all of these factors must be present or highly probative in every case to justify reasonable suspicion." *United States v. Valdes-Vega*, 738 F.3d 1074, 1079 (9th Cir. 2013).

The Supreme Court has held that courts should not engage in a "divide-and-conquer analysis" when reviewing the factors considered by law enforcement. *Arvizu*, 534 U.S. at 274. Stated another way, it is inappropriate to view factors in isolation and to give no weight to factors which may have an innocent explanation. *Arvizu*, 534 U.S. at 273–275. The Supreme Court has held that "even when factors considered in isolation from each other are susceptible to an innocent explanation, they may collectively amount to a reasonable suspicion." *United States v. Berber-Tinoco*, 510 F.3d 1083, 1087 (9th Cir. 2007) (citing *Arvizu*, 534 U.S. at 274). Therefore, what may seem to be innocuous conduct when viewed in isolation may be appropriately considered when analyzing the totality of the circumstances. *Arvizu*, 534 U.S. at 273–75; *see also Cotterman*, 709 F.3d at 970 ("It is not our province to nitpick the factors in isolation but instead to view them in the totality of the circumstances.").

Although an "an officer's experience may furnish the background against which the relevant facts are to be assessed[,] … 'experience' does not in itself serve as an independent factor in the reasonable suspicion analysis." *Montero-Camargo*, 208 F.3d at 1131. That said, when looking at the "totality of the circumstances" the court "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Id.* (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)). "In other words, an officer's experience may furnish the background against which the relevant facts are to

be assessed, as long as the inferences he draws are objectively reasonable." *United States v. Montero-Camargo*, 208 F.3d, 1122, 1131 (2000).  As a result, "the facts supporting reasonable suspicion must be filtered through the lens of the [law enforcement officer's] training and experience" and a court must give "due weight" to factual inferences drawn by officers.  *United States v. Valdes-Vega*, 738 F.3d 1074, 1079 (9th Cir. 2013).

### A. *Characteristics of the area in which law enforcement encountered the vehicle and the proximity to the border.*

The stop of the defendant's vehicle was made on a road commonly used by alien smugglers. Agent Ramirez testified that there are no operational Border Patrol checkpoints on SR 82, SR 83, or SR 90.  For that reason, smugglers use these roads to get to Interstate 10 to avoid the permanent Border Patrol checkpoint on Interstate 19.  The defendant was traveling from the Nogales, Arizona area, which abuts the international border.  Agent Ramirez first saw the defendant's vehicle about 23 miles from the international border and he performed his traffic stop about 28 miles from the border.  Thus, both Agent Ramirez's initial encounter with the defendant and the stop occurred in close proximity to the international border.

### B. *The defendant's driving behavior and the usual traffic patterns on the particular road.*

Agent Ramirez found it suspicious that the defendant's vehicle was traveling at an unusually slow speed.  The defendant was driving so slowly that there was a line of cars behind him.  Agent Ramirez found that driving behavior suspicious because vehicles travelling on this section of SR 82 usually drive above the speed limit.  Additionally, when Agent Ramirez was following the defendant's vehicle, he observed the defendant "swerving within the fog lines," which was significant to Agent Ramirez because it was indicative of the defendant being fixated on him rather than concentrating on the road ahead.

### C. *The behavior and appearance of the driver*.

The defendant demonstrated nervous driving behavior when he passed Agent

Ramirez's patrol vehicle.  Agent Ramirez testified that the defendant had a rigid posture, was tightly gripping the steering wheel, and was looking straight ahead and did not even glance at Agent Ramirez's patrol vehicle.  In Agent Ramirez experience, it is common for people involved in smuggling to exhibit this type of nervous behavior because they are anxious or highly stressed.

### D. *Aspects of the vehicle*.

The defendant's vehicle appeared heavily laden.  Agent Ramirez described how the vehicle would "bottom out" when going over slight deviations in the road.  As a result, Agent Ramirez suspected that there were more occupants in the vehicle than just the driver.  Because of the dark window tinting, Agent Ramirez could not confirm if the vehicle appeared heavily laden because of the number of occupants or a mechanical issue (*e.g.*, an issue with the vehicle's suspension).

The defendant was driving an "older model vehicle" which was significant to Agent Ramierz because alien smugglers routinely use older vehicles to minimize financial loss if the vehicle is seized by law enforcement.  Agent Ramirez explained that the defendant's vehicle was valued at $1,800 and the owner must pay $5,000 to retrieve a seized vehicle.

Additionally, the defendant's vehicle had a temporary license plate, which is another tactic used by alien smugglers.  Agent Ramiez testified that it is harder for agents to obtain information about the registered owner of a vehicle with a temporary license plate, other than the owner's name and the city where the vehicle is registered.  Moreover, Agent Ramirez testified that he has had alien smuggling cases where smugglers forge temporary plates to conceal their identity.

Finally, the defendant's vehicle was registered in Avondale, Arizona, which is located 150-200 miles from Sonoita, Arizona.  Agent Ramirez testified that because of the large population in the Phoenix area, alien smuggling coordinators commonly recruit people from that area to pick up illegal aliens at or near the international border.

As discussed earlier, although each of the factors discussed above may be susceptible to an innocent explanation when considered in isolation, they can collectively

amount to reasonable suspicion. That is the case here. Based on Agent Ramirez's experience with how alien smugglers operate and the totality of the circumstances that he identified as the basis for his stop, the Court concludes there was a reasonable suspicion to stop the defendant's vehicle. As a result, the Court recommends that the District Court deny the instant motion.

### E. The Defendant's Race:

Defense counsel asserts that he "is also concerned that underlying this stop and arrest is Mr. Minfee's race and a sense that that he did not belong in Southern Arizona." (Doc. at 6.) Counsel argues that "[a]t no point does Agent Ramirez acknowledge that Mr. Minfee is black and that the individual in the passenger seat was Hispanic, even though he alleged he looked through the front window of the vehicle clearly enough to note 'the tight grip' on the steering wheel." (*Id*.) Defense counsel also points to statistics that reflect that "black drivers were, on average, stopped more often than white drivers." (*Id*. at 7.) However, counsel is unaware whether the Department of Homeland Security keeps statistics of "stops by race and their outcomes." (*Id*.)

Agent Ramirez made clear that the defendant's race played no role in his decision to stop his vehicle. (*Id*. at 14.) Agent Ramirez has had and continues to have implicit bias training to ensure that race plays no role in his traffic stops or his job. The Court has no reason to discredit this testimony.

Although Agent Ramirez testified that he believed that someone within Border Patrol keeps statistics about traffic stops that do not result in an arrest, he was mistaken. Defense counsel submitted a Supplemental Brief in which he noted that Border Patrol personnel advised government counsel that the Border Patrol "does not maintain records on all vehicle stops made by agents. There are radio logs that are kept for a limited period, but they would have to be reviewed manually . . . to create a log of stops." (Doc. 60.) And the radio logs are unlikely to provide reliable data about race because that information is not typically requested or conveyed via the radio. (*Id*.) Moreover, "[r]ace is also not a data point that Border Patrol tracks in its vehicle stops." (*Id*.) Basic biographical data taken

from arrestees includes their country of citizenship, "but the data does not typically include race." (*Id.*)  However, basic biographical data is typically not saved when a person is not arrested.  (*Id.*)

Given Agent Ramirez's testimony that race played no role in his stop and the absence of any records that identify the race of individuals who have encounters with Border Patrol agents, defense counsel has no support for his argument that race played a role in the stop of the defendant.

**IV.    CONCLUSION**

The Court concludes that based on the totality of the circumstances discussed above, Agent Ramirez had a reasonable suspicion to stop the defendant's vehicle.

**V.     RECOMMENDATION**

For the foregoing reasons, it is recommended that the District Judge deny the defendant's Motion to Suppress (Doc. 48.)

Pursuant to 28 U.S.C. §636(b) and Rule 59(b)(2) of the Federal Rules of Criminal Procedure, any party may serve and file written objections within fourteen (14) days after being served with a copy of this Report and Recommendation.  No reply shall be filed unless leave is granted from the District Court.  If objections are filed, the parties should use the following case number: **CR-25-04834-TUC-JCH.**

Failure to file timely objections to any factual or legal determination of the Magistrate Judge in accordance with Fed. R. Crim. P. 59 may result in waiver of the right of review.

Dated this 19th day of March, 2026.

Eric J. Markovich
United States Magistrate Judge

- 9 -